Javier L. Merino, Esq. (NJ Attorney No. 078112014)
**THE DANN LAW FIRM, PC**
825 Georges Road, 2nd Floor
North Brunswick, NJ 08902
(201) 355-5440
notices@dannlaw.com
*Counsel for Plaintiff and the Putative Class*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **JORDAN BURWELL,** individually and on behalf of all others similarly situated,<br>Plaintiff,<br>vs.<br>**CONDUENT BUSINESS SERVICES, LLC,**<br>Defendant. | Civil Action No. 2:25-cv-17170<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES**<br><br>**Jury Trial Demanded** |

Plaintiff Jordan Burwell, on behalf of herself and all others similarly situated, alleges the following against Defendant Conduent Business Services , LLC, upon personal knowledge as to his own acts, and based upon his investigation, his counsel's investigation, and information and belief as to all other matters.

## INTRODUCTION

1. This is a class action arising from one of the largest healthcare data breaches in recent history. On January 13, 2025, Defendant Conduent Business

Services, LLC—a New Jersey-based business process and digital services provider—discovered that cybercriminals had infiltrated its systems and stolen the highly sensitive personally identifiable information and protected health information of approximately 10,515,849 individuals nationwide, including Plaintiff Jordan Burwell. The compromised information includes names, addresses, dates of birth, Social Security numbers, medical information, and health insurance details—immutable identifiers that create lifelong risks of identity theft, medical identity theft, tax fraud, and financial fraud.

2. The breach itself was egregious. Unauthorized actors accessed Defendant's systems from October 21, 2024, through January 13, 2025—nearly three months—during which time they exfiltrated files containing unencrypted Private Information. Defendant's inadequate security measures failed to detect the intrusion, failed to prevent the exfiltration, and failed to protect the data through encryption or other basic safeguards required by federal law, industry standards, and its own contractual obligations.

3. Defendant's response was even more egregious. Despite discovering the breach on January 13, 2025, Defendant waited approximately ten months—until October 24, 2025—to notify affected individuals. This unconscionable delay deprived Plaintiff and Class Members of the ability to

promptly take protective measures, substantially increasing their risk of harm and the likelihood that their stolen information would be misused before they could act.

4. Defendant is a HIPAA business associate that processes claims, manages benefits, and handles sensitive health information on behalf of health insurance plans including Blue Cross and Blue Shield entities across the country. As a business associate, Defendant was directly subject to the HIPAA Security Rule's comprehensive data security requirements, including obligations to encrypt protected health information, implement access controls and intrusion detection, conduct regular risk assessments, and provide timely breach notification. Defendant violated each of these obligations.

5. Defendant also violated Section 5 of the Federal Trade Commission Act, which prohibits unfair practices including the failure to implement reasonable data security measures. The FTC has repeatedly held that entities handling sensitive personal information must implement basic safeguards including encryption, access controls, monitoring, and employee training. Defendant failed to implement these basic measures despite knowing that healthcare entities are prime targets for cybercriminals due to the high value of medical and personal information on the black market.

6. Defendant knew or should have known that its security was inadequate. Healthcare data breaches have increased exponentially in recent years,

with thousands of breaches exposing billions of sensitive records. The FBI and U.S. Secret Service have issued specific warnings to healthcare entities about the targeting of their systems. Industry publications have extensively documented the vulnerability of healthcare data and the necessity of robust security measures. Despite these warnings, and despite its legal obligations, Defendant chose to prioritize profits over security, failing to invest adequate resources in protecting the Private Information entrusted to it.

7. The consequences for Plaintiff and Class Members are severe and permanent. Social Security numbers and medical information cannot be changed. The stolen data has been or will be sold on the dark web, where it will be purchased by identity thieves who will use it for years or decades to commit fraud in victims' names. Victims face a lifetime of increased vigilance, monitoring costs, and risk. Many will experience actual identity theft, medical identity theft, or fraud. Some have already experienced fraudulent use of their information. All face imminent, substantial, and ongoing risk that will never fully abate.

8. Plaintiff brings this action on behalf of herself and all others similarly situated to hold Defendant accountable for its failures, to obtain compensation for the harms suffered, and to require Defendant to implement adequate security measures to protect the Private Information that remains in its possession. Plaintiff asserts claims for negligence, negligence per se based on violations of the FTC Act

and HIPAA, breach of third-party beneficiary contract, breach of implied contract, unjust enrichment, invasion of privacy, and violation of the Ohio Consumer Sales Practices Act.

9. Plaintiff seeks compensatory damages, consequential damages, punitive damages, and treble damages where authorized by statute; restitution and disgorgement of unjustly retained benefits; declaratory relief; and comprehensive injunctive relief requiring Defendant to implement and maintain robust security measures, provide extended credit monitoring and identity theft protection services to the Class, and submit to ongoing independent verification and court supervision to ensure compliance. Plaintiff also seeks attorneys' fees, costs, and all other relief the Court deems just and proper.

## PARTIES

### A. Plaintiff

10. Plaintiff Jordan Burwell is a natural person and citizen and resident of Bloomville, Ohio, residing at 1895 Chatfield Center Road, Bloomville, Ohio 44818.

11. Plaintiff is a member or beneficiary of Blue Cross and Blue Shield of Illinois, a health insurance plan that contracted with Defendant to provide business services including claims processing, payment integrity, benefit administration, and

other functions requiring access to and maintenance of members' protected health information.

12. As a condition of receiving healthcare services and insurance benefits through Blue Cross and Blue Shield of Illinois, Plaintiff's highly sensitive personally identifiable information and protected health information, including his name, address, date of birth, and Social Security number, were necessarily provided to and maintained by Defendant in the course of Defendant's provision of services to Blue Cross and Blue Shield of Illinois.

13. Plaintiff's Private Information was accessed and exfiltrated by unauthorized third parties during the Data Breach that occurred from October 21, 2024, through January 13, 2025.

14. On or about October 24, 2025, Plaintiff received written notification from Defendant informing her that his Private Information had been compromised in the Data Breach. This notification came approximately ten months after Defendant discovered the breach.

15. As a direct result of the Data Breach, Plaintiff has suffered and continues to suffer harm including loss of privacy, increased risk of identity theft and fraud, out-of-pocket expenses, lost time, emotional distress, and the need for ongoing monitoring and vigilance. Plaintiff faces an imminent, substantial, and

continuing risk that his Private Information will be misused for identity theft, medical identity theft, tax fraud, financial fraud, or other criminal purposes.

16. Plaintiff brings this action on behalf of herself and all others similarly situated whose Private Information was compromised in the Data Breach.

**B. Defendant**

17. Defendant Conduent Business Services, LLC is a New Jersey limited liability company with its principal place of business at 100 Campus Drive, Suite 200, Florham Park, New Jersey 07932.

18. Defendant is a provider of digital business solutions and services to clients in the healthcare, commercial, government, and transportation sectors. In the healthcare sector, Defendant provides claims processing and adjudication, payment integrity services, health plan administration, benefit enrollment, eligibility verification, customer service, and support for Medicaid and other public health programs.

19. Defendant provides these services to health insurance plans, healthcare providers, government agencies, and other entities nationwide (collectively, "Clients"), and derives substantial revenue from these services.

20. As a necessary component of providing these services, Defendant routinely collects, receives, stores, accesses, analyzes, processes, and transmits large volumes of highly sensitive personally identifiable information and protected

health information belonging to millions of patients, health plan members, and healthcare consumers throughout the United States.

21. Defendant is a "business associate" as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 45 C.F.R. § 160.103, because it creates, receives, maintains, and transmits protected health information on behalf of covered entities including health insurance plans and healthcare providers. As a business associate, Defendant is directly subject to and required to comply with the HIPAA Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C, and the Health Information Technology for Economic and Clinical Health Act ("HITECH"), 42 U.S.C. § 17921 et seq.

22. At all relevant times, Defendant held itself out as capable of securely handling sensitive health and personal information, represented that it maintained appropriate security measures, and accepted the responsibility of safeguarding the Private Information of millions of individuals including Plaintiff and Class Members.

23. Defendant's services are provided to Clients nationwide, including in this District, and Defendant conducts substantial business throughout the United States.

24. At all relevant times, Defendant acted by and through its authorized officers, directors, employees, agents, and representatives in conducting its

business operations, making decisions regarding data security, and responding to the Data Breach.

## JURISDICTION AND VENUE

25. This Court has subject-matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5,000,000, exclusive of interest and costs; the proposed class consists of at least 100 members; and at least one member of the proposed Class is a citizen of a state different from Defendant's citizenship, thereby satisfying minimal diversity. Defendant maintains its principal place of business in this District.

26. This Court has personal jurisdiction over Defendant because Defendant is registered to do business in New Jersey and maintains its principal place of business at 100 Campus Drive, Suite 200, Florham Park, New Jersey 07932. Defendant has continuous and systematic contacts with this District, and a substantial part of the acts, events, and omissions giving rise to the claims occurred in and emanated from this District.

27. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), 1391(b)(2), and 1391(c)(2) because Defendant's principal place of business is located in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims—including decisions, policies, practices, and

failures concerning the safeguarding of Private Information and the timing and adequacy of breach notification—occurred in this District.

## FACTUAL ALLEGATIONS

### A. Background on Defendant

28. Defendant Conduent Business Services, LLC is a provider of digital business solutions and services to clients across the healthcare, commercial, government, and transportation sectors (the "Clients"), and maintains its principal place of business at 100 Campus Drive, Suite 200, Florham Park, New Jersey 07932.[1]

29. Conduent performs claims processing and adjudication, payment integrity, health-plan administration, and support for Medicaid and public-health programs for health plans and providers. In connection with these services, Conduent acquires, receives, stores, analyzes, and transmits large volumes of sensitive personally identifiable information and protected health information belonging to patients and plan members of its clients.

30. Defendant's business model depends upon the routine intake and maintenance of sensitive Private Information, and Defendant derives substantial economic benefit from its possession and use of such information.

---

[1] About Conduent, Conduent Business Services, LLC: https://www.conduent.com/about-conduent/ (last visited Nov. 3, 2025).

**B. Defendant's Collection and Use of Private Information**

31. As a condition of doing business, Defendant requires that its Clients entrust it with highly sensitive personal information belonging to their clients and members. In the ordinary course of receiving services from Defendant's Clients, Plaintiff and Class Members were required to have their Private Information provided to and maintained by Defendant.

32. Upon information and belief, Defendant made promises and representations to individuals that the Private Information collected from them would be kept safe and confidential, and that the privacy of that information would be maintained.

33. Plaintiff and Class Members provided their Private Information to Defendant's Clients with the reasonable expectation and on the mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

34. Defendant retains and stores this information and derives a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiff's and Class Members' Private Information, Defendant would be unable to perform its services for its Clients.

35. At all relevant times, Defendant knew it was storing sensitive Private Information and that, as a result, its systems would be an attractive target for cybercriminals.

36. Defendant also knew that a breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

## C. Defendant's Legal and Contractual Duties to Safeguard Private Information

### 1. Common Law Duties

37. In addition to its obligations under federal and state laws, Defendant owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

38. Defendant owed a duty to Plaintiff and Class Members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its computer systems, networks, and protocols adequately protected the Private Information of Class Members.

39. Defendant owed a duty to Plaintiff and Class Members to create and implement reasonable data security practices and procedures to protect the Private

Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

40. Defendant owed a duty to Plaintiff and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

41. Defendant owed a duty to Plaintiff and Class Members to act upon data security warnings and alerts in a timely fashion.

42. Defendant owed a duty to Plaintiff and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred, including specifically what types of information were compromised for each individual.

43. Defendant owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

44. Defendant had a special relationship with Plaintiff and Class Members that arose from Plaintiff's and Class Members' entrusting Defendant with their Private Information with the understanding that Defendant would adequately protect it. Only Defendant had the ability to protect its systems (and the Private Information that it stored on them) from attack.

**2. FTC Act Obligations**

45. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information.

46. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

47. In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses.[2] These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[3]

---

[2] Protecting Personal Information: A Guide for Business, FEDERAL TRADE COMMISSION (2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Nov. 3, 2025).
[3] *Id.*

48. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[4]

49. The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

50. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTCA. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

51. These FTC enforcement actions include actions against healthcare entities that fail to adequately protect patients' data, like Defendant. See, e.g., *In the*

[4] *Id.*

*Matter of LabMD, Inc., a corp*, 2016-2 Trade Cas. (CCH) ¶79708, 2016 WL 4128215, at *32 (FTC July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

52. The FTC publications and orders described above form part of the basis of Defendant's duty to protect Private Information.

**3. HIPAA and HITECH Obligations**

53. Defendant is a business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

54. Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology for Economic and Clinical Health Act ("HITECH").[5] See 42 U.S.C. § 17921, 45 C.F.R. § 160.103.

[5] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

55. HIPAA's Privacy Rule or Standards for Privacy of Individually Identifiable Health Information establishes national standards for the protection of health information.

56. HIPAA's Security Rule or Security Standards for the Protection of Electronic Protected Health Information establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

57. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

58. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

59. HIPAA's Security Rule requires Defendant to do the following:

a) Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b) Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c) Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d) Ensure compliance by its workforce.

60. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

61. HIPAA and HITECH also obligate Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic PHI that are reasonably anticipated but not permitted by the privacy rules. See 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); see also 42 U.S.C. § 17902.

62. HIPAA requires a business associate to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the business associate or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

63. HIPAA requires a business associate to mitigate, to the extent practicable, any harmful effect that is known to the business associate of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the business associate. See 45 C.F.R. § 164.530(f).

64. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. See 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost-effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule."[6] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI."[7]

---

[6] US Department of Health & Human Services, Security Rule Guidance Material, https://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Nov. 3, 2025).

[7] US Department of Health & Human Services, Guidance on Risk Analysis, https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Nov. 3, 2025).

**4. Industry Standards**

65. As noted above, experts studying cybersecurity routinely identify entities in possession of PII and PHI as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

66. Several best practices have been identified that at a minimum should be implemented by companies in possession of PII and PHI, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

67. Other best cybersecurity practices that are standard for companies include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system breaches; and training staff regarding critical security points.

68. Upon information and belief, Defendant failed to implement industry-standard cybersecurity measures, including failing to meet the minimum

standards of both the NIST Cybersecurity Framework Version 2.0 (including without limitation PR.AA-01, PR.AA-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR.DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04).[8]

69. These foregoing frameworks are existing and applicable industry standards for a business and healthcare service provider's obligations to provide adequate data security for its clients' sensitive information.

**D. The Foreseeability of Cyberattacks Targeting Healthcare Data**

70. Data thieves regularly target entities in the healthcare industry like Defendant due to the highly sensitive information that they maintain. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

71. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches targeting healthcare entities like Defendant that collect and store Private Information and other sensitive information, preceding the date of the Data Breach.

[8] See NIST Cybersecurity Framework Version 2.0, NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, https://www.nist.gov/cyberframework (last visited Nov. 3, 2025).

72. In light of recent high-profile data breaches at other industry-leading companies, including, e.g., Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estée Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the Private Information that it collected and maintained would be targeted by cybercriminals.

73. In 2024, 3,158 data breaches occurred, exposing approximately 1,350,835,988 sensitive records—a 211% increase year-over-year.[9]

74. The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[10]

75. Entities in custody of PHI and/or medical information reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach.[11] Indeed, when compromised, healthcare-related data is among the most sensitive and personally consequential.

[9] 2024 Data Breach Annual Report, IDENTITY THEFT RESOURCE CENTER, https://www.idtheftcenter.org/publication/2024-data-breach-report/ (last visited Nov. 3, 2025).
[10] *Id*.
[11] See Identity Theft Resource Center, 2022 Annual Data Breach Report, https://www.idtheftcenter.org/publication/2022-data-breach-report/ (last visited Nov. 3, 2025).

76. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out-of-pocket costs for healthcare they did not receive in order to restore coverage.[12] Almost 50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event. Forty percent of the patients were never able to resolve their identity theft at all. Data breaches and identity theft have a crippling effect on individuals, and detrimentally impact the economy as a whole.[13]

77. Indeed, cyberattacks on medical systems and healthcare and healthcare-adjacent companies like Defendant have become so notorious that the FBI and U.S. Secret Service have issued warnings to potential targets, so they are aware of, and prepared for, a potential attack.[14] As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive . . . because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[15]

---

[12] See Elinor Mills, Study: Medical identity theft is costly for victims, CNET (March 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last visited Nov. 3, 2025).

[13] *Id.*

[14] Secret Service Warn of Targeted, Law360, https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware (last visited Nov. 3, 2025).

[15] *Id.*

78. Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiff and Class Members from being compromised.

79. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

80. As a healthcare entity in possession of its clients' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiff and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members because of a breach.

**E. The Data Breach**

81. On January 13, 2025, Defendant discovered that it was the victim of a cyber incident. *See* **Exhibit A**, Data Breach Notification. In response, Defendant launched an investigation to determine the nature and scope of the Data Breach. *Id*.

82. Defendant's investigation determined that an unauthorized third party had access to its IT Network from October 21, 2024, to January 13, 2025—a period of nearly three months—and was able to exfiltrate files on Defendant's IT

Network containing Private Information of clients belonging to Defendant's Clients. *Id*.

83. Upon information and belief, the following types of Private Information were compromised as a result of the Data Breach: name, address, date of birth, Social Security number, medical and health insurance information, and other protected health information.

84. Public reporting indicates that the Data Breach affected approximately 10,515,849 individuals nationwide, including members of various Blue Cross Blue Shield plans and other health insurance plans.[16]

85. On or around October 24, 2025—approximately ten months after becoming aware of the Data Breach—Defendant issued notices of public disclosure about the Data Breach to affected individuals, including Plaintiff.

86. The Data Breach resulted in unauthorized third parties accessing and acquiring files containing unencrypted Private Information of Plaintiff and Class Members. Plaintiff and Class Members' Private Information was accessed and stolen in the Data Breach.

87. Upon information and belief, Plaintiff's Private Information, and that of Class Members, was subsequently published on the dark web following the Data

[16] https://www.hipaajournal.com/conduent-business-solutions-data-breach/ (last visited Nov. 3, 2025).

Breach, as that is the modus operandi of cybercriminals that commit cyberattacks of this type.

88. Individuals affected by the Data Breach are, and remain, at risk that their data will be sold or listed on the dark web and, ultimately, illegally used in the future.

**F. Defendant's Failures to Implement Reasonable Security Measures**

89. Defendant violated its duty to implement and maintain reasonable security procedures and practices. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiff and Class Members.

90. Defendant failed to take precautions designed to keep individuals' Private Information secure.

91. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, such as encrypting the information or implementing adequate access controls and monitoring systems.

92. Defendant's negligence in safeguarding the Private Information of Plaintiff and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

93. Upon information and belief, Defendant failed to comply with at least one—or all—of the accepted industry standards described above, including FTC guidelines, HIPAA requirements, and NIST frameworks, thereby opening the door to the threat actor and causing the Data Breach.

94. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

a) Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;

b) Failing to adequately encrypt Private Information stored on its systems;

c) Failing to implement adequate access controls to limit access to sensitive data;

d) Failing to adequately monitor the security of its networks and systems;

e) Failing to implement adequate intrusion detection systems and monitoring mechanisms;

f) Failing to periodically ensure that its systems maintained reasonable data security safeguards;

g) Allowing unauthorized access to Class Members' Private Information for nearly three months;

h) Failing to adequately train employees and others who accessed Private Information on how to protect such information;

i) Failing to implement adequate network segmentation to prevent lateral movement by attackers;

j) Failing to comply with the FTC Act, HIPAA, and industry standards;

k) Failing to detect in a timely manner that Class Members' Private Information had been compromised; and

l) Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

95. Upon information and belief, Defendant failed to properly monitor and implement security practices with regard to the computer network and systems that housed the Private Information. Had Defendant properly monitored its IT Network, it would have discovered the Breach sooner and could have prevented or limited the exfiltration of data.

96. Defendant acted with reckless disregard for the rights of Plaintiff and Class Members by failing to provide prompt and adequate individual notice of the Data Breach such that Plaintiff and Class Members could take measures to protect themselves from damages caused by the fraudulent use of the Private Information compromised in the Data Breach.

97. As a result of Defendant's ongoing failure to timely notify Plaintiff and Class Members regarding the Data Breach, Plaintiff and Class Members have been unable to take the necessary precautions to prevent future fraud and mitigate damages.

98. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

99. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiff and Class Members are long-lasting and severe. Once Private Information is stolen, fraudulent use of that information and damage to victims may continue for years.

**G. Plaintiff Jordan Burwell's Experience**

100. Plaintiff Jordan Burwell is a citizen and resident of Bloomville, Ohio.

101. Upon information and belief, Plaintiff was a member of Blue Cross and Blue Shield of Illinois, one of Defendant's Clients.

102. As a condition of obtaining healthcare services and insurance coverage, Plaintiff was required to have her Private Information provided to and maintained by Defendant.

103. Defendant was in possession of Plaintiff's Private Information before, during, and after the Data Breach.

104. On or about October 24, 2025, Plaintiff received written notification from Defendant informing her that her Private Information had been compromised in the Data Breach. The notification letter, received at Plaintiff's residence at 1895 Chatfield Center Road, Bloomville, Ohio 44818-9352, stated that an unauthorized third party had access to Defendant's systems from October 21, 2024, to January 13, 2025, and that files associated with Blue Cross and Blue Shield of Illinois, which contained Plaintiff's information, were obtained. *See* Ex. A.

105. According to the notification letter, the compromised information included Plaintiff's name, address, date of birth, and Social Security number. *Id*.

106. Plaintiff reasonably understood and expected that Defendant would safeguard her Private Information and timely and adequately notify her in the event of a data breach. Plaintiff would not have allowed Defendant, or anyone in Defendant's position, to maintain her Private Information if she believed that Defendant would fail to implement reasonable and industry-standard practices to safeguard that information from unauthorized access.

107. Plaintiff greatly values her privacy and Private Information and takes reasonable steps to maintain the confidentiality of his Private Information. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

108. Plaintiff stores any and all documents containing Private Information in a secure location and destroys any documents she receives in the mail that contain any Private Information or that may contain any information that could otherwise be used to compromise her identity and accounts.

109. Moreover, she diligently chooses unique usernames and passwords for his various online accounts.

110. Upon information and belief, as a result of the Data Breach, Plaintiff's Private Information was compromised and is now in the hands of cybercriminals.

111. As a result of the Data Breach, Plaintiff has spent several hours researching the Data Breach, reviewing her bank accounts, monitoring her credit report, changing her passwords, and undertaking other necessary mitigation efforts. This is valuable time that Plaintiff would have spent on other activities, including but not limited to work and/or recreation.

112. As a consequence of and following the Data Breach, Plaintiff has experienced anxiety and concern about the potential misuse of his Private Information.

113. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress about the safety and security of her Private Information and the potential for identity theft and fraud.

114. Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. In addition, Plaintiff will continue to be at present and continued increased risk of identity theft and fraud for years to come.

115. Plaintiff has a continuing interest in ensuring that her Private Information, which upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

116. As a direct and traceable result of the Data Breach, Plaintiff suffered actual injury and damages after his Private Information was compromised and stolen in the Data Breach, including, but not limited to: (a) lost time and money related to monitoring his accounts and credit reports for fraudulent activity; (b) loss of privacy due to her Private Information being accessed and stolen by cybercriminals; (c) loss of the benefit of the bargain because Defendant did not adequately protect his Private Information; (d) emotional distress because identity thieves now possess his sensitive Private Information; (e) imminent and impending injury arising from the increased risk of fraud and identity theft now that her Private Information has been stolen and likely published on the dark web; (f) diminution in the value of his Private Information, a form of intangible property that Defendant obtained from Plaintiff; and (g) other economic and non-economic harm.

### H. Harm to Plaintiff and Class Members

#### 1. Increased Risk of Identity Theft and Fraud

117. The unencrypted Private Information of Plaintiff and Class Members has been, upon information and belief, posted on the dark web and will end up further disseminated and sold to criminals on the dark web, as that is the modus operandi of hackers.

118. Unencrypted Private Information may also fall into the hands of companies that will use the detailed data for targeted marketing without the approval of Plaintiff and Class Members.

119. Simply put, unauthorized individuals can easily access the Private Information of Plaintiff and Class Members because of the Data Breach.

120. Cyberattacks and data breaches at healthcare companies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

121. Researchers have found that among healthcare service providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[17]

---

[17] See Nsikan Akpan, Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks. (last visited Nov. 4, 2025).

122. Researchers have further found that at healthcare service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[18]

123. The link between a data breach and the risk of identity theft is simple and well-established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft-related crimes.

124. Plaintiff's and Class Members' Private Information is of great value to hackers and cybercriminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of ways for criminals to exploit Plaintiff and Class Members and to profit from their misfortune.

125. Stolen Private Information is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII alone can be worth up to $1,000.00 depending on the type of information obtained.[19]

---

[18] See Sung J. Choi et al., Data Breach Remediation Efforts and Their Implications for Hospital Quality, 54 HEALTH SERVICES RESEARCH 971, 971-980 (2019), https://onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203. (last visited Nov. 4, 2025)

[19] Brian Stack, Here's How Much Your Personal Information Is Selling for on the Dark Web,

126. The value of Plaintiff's and the Class's Private Information on the black market is considerable. Stolen Private Information trades on the black market for years, and criminals frequently post stolen Private Information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

127. It can take victims years to spot identity theft, giving criminals plenty of time to use that information for cash.

128. One such example of criminals using Private Information for profit is the development of "Fullz" packages.

129. Cybercriminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.[20]

130. The development of "Fullz" packages means that stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiff and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the

---

EXPERIAN (Dec. 6, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-yourpersonal-information-is-selling-for-on-the-dark-web/. (Last visited Nov. 4, 2025).

[20] https://blog.geetest.com/en/article/what-is-fullz (last visited Nov. 3, 2025).

Private Information stolen by the cybercriminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.[21] That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and the Class's stolen Private Information is being misused, and that such misuse is fairly traceable to the Data Breach.

131. Identity thieves can also use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud. According to Experian, one of the largest credit reporting companies in the world, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan, change a billing address so the victim no longer receives bills, open new utilities, obtain a mobile phone, open a bank account and write bad checks, use a debit card number to withdraw funds, obtain a new driver's license or ID, and/or use the victim's information in the event of arrest or court action.

132. Identity thieves can also use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the

[21] *Id.*

victim's information. In addition, identity thieves may obtain a job using the victim's Social Security number, and/or rent a house or receive medical services in the victim's name.

133. The Social Security Administration has similarly warned that identity thieves can use an individual's Social Security number to apply for additional credit lines. Such fraud may go undetected until debt collection calls commence months, or even years later. Stolen Social Security numbers also make it possible for thieves to file fraudulent tax returns, file for unemployment benefits, or apply for a job using a false identity. Each of these fraudulent activities is difficult to detect. An individual may not know that his or her Social Security number was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected because one was already filed on their behalf.

134. Further, an individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. Even then, a new Social Security number may not be effective, as "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[22]

[22] Brian Naylor, Victims of Social Security Number Theft Find It's Hard to Bounce Back, NPR (Feb. 9, 2015),

135. This was a financially motivated Data Breach, as the only reason the cybercriminals go through the trouble of running a targeted cyberattack against companies like Defendant is to get information that they can monetize by selling on the black market for use in the kinds of criminal activity described herein. This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security Numbers are worth more than 10x on the black market."[23]

136. Indeed, a Social Security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[24] "[I]f there is reason to believe that your personal information has been stolen, you should assume that it can end up for sale on the dark web."[25]

---

http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millions-worrying-about-identity-theft (last visited Nov. 3, 2025).

[23] Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Nov. 3, 2025).

[24] Michael Kan, Here's How Much Your Identity Goes for on the Dark Web, PCMAG (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web. (last visited Nov. 3, 2025).

[25] Dark Web Monitoring: What You Should Know, Consumer Federation of America (Mar. 19, 2019), https://consumerfed.org/consumer_info/dark-web-monitoring-what-you-should-know/ (last visited Nov. 3, 2025).

137. These risks are both certainly impending and substantial. As the FTC has reported, if hackers get access to PHI/PII, they will use it.[26]

138. Approximately 21% of victims did not realize their identity had been compromised until more than two years after it happened.[27] This gives thieves ample time to seek multiple treatments under the victim's name. Forty percent of consumers found out they were a victim of medical identity theft only when they received collection letters from creditors for expenses that were incurred in their names.[28]

139. Identity theft victims must spend countless hours and large amounts of money repairing the impact to their credit as well as protecting themselves in the future.[29]

140. Defendant's failure to properly notify Plaintiff and members of the Class of the Data Breach in a timely manner exacerbated Plaintiff's and the Class's injury by depriving them of the earliest ability to take appropriate measures to

[26] *Id*.
[27] See Medical ID Theft Checklist, IDENTITY FORCE, https://www.identityforce.com/blog/medical-id-theft-checklist-2 (last visited Nov. 3, 2025).
[28] The Potential Damages and Consequences of Medical Identity Theft and Healthcare Data Breaches ("Potential Damages"), EXPERIAN, https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf (last visited Nov. 3, 2025).
[29] Guide for Assisting Identity Theft Victims, FED. TRADE COMM'N, 4 (Sept. 2013), http://www.consumer.ftc.gov/articles/pdf-0119-guide-assisting-id-theft-victims.pdf. (last visited Nov. 3, 2025).

protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

**2. Actual Time and Money Lost to Mitigation Efforts**

141. As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft or fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

142. Thus, due to the actual and imminent risk of identity theft, Plaintiff and Class Members must monitor their financial accounts for many years to mitigate the risk of identity theft.

143. Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as reviewing bank statements, credit card statements, and credit reports; changing passwords; placing fraud alerts; implementing credit freezes; and resecuring their own systems.

144. Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face

"substantial costs and time to repair the damage to their good name and credit record."[30]

145. Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[31]

146. And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[32]

**3. Diminution in Value of Private Information**

---

[30] See United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Nov. 3, 2025).
[31] See Federal Trade Commission, Identity Theft.gov, https://www.identitytheft.gov/Steps (last visited Nov. 3, 2025).
[32] See United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf (last visited Nov. 3, 2025).

147. Private Information is valuable property.[33] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that Private Information has considerable market value.

148. The Private Information stolen in the Data Breach is significantly more valuable than the loss of, say, credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply canceling credit or debit cards and obtaining replacements. The information stolen in the Data Breach is difficult, if not impossible, to change.

149. This kind of data, as one would expect, demands a much higher price on the dark web. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[34]

---

[33] See "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," at 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf (last visited Nov. 3, 2025) ("GAO Report").

[34] Tim Greene, Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers, IT WORLD (Feb. 6, 2015), http://www.itworld.com/article/2880960/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited Nov. 3, 2025).

150. Sensitive Private Information can sell for as much as $363 per record according to the Infosec Institute.[35]

151. An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[36] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[37] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[38]

152. As a result of the Data Breach, Plaintiff's and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized

[35] See, e.g., John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted); Ashiq Ja, Hackers Selling Healthcare Data in the Black Market, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Nov. 3, 2025).

[36] https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Nov. 3, 2025).

[37] https://datacoup.com/ (last visited Nov. 3, 2025).

[38] https://www.thepennyhoarder.com/make-money/nielsen-panel/#:~:text=Sign%20up%20to%20join%20the,software%20installed%20on%20your%20computer (last visited Nov. 3, 2025).

release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

153. The fraudulent activity resulting from the Data Breach may not come to light for years.

154. Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

155. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to millions of individuals' detailed Private Information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

156. The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiff and Class Members.

**4. Future Costs of Credit and Identity Theft Monitoring**

157. Given the type of targeted attack in this case, the sophisticated criminal activity, the volume of data compromised in this Data Breach, and the

sensitive type of Private Information involved in this Data Breach, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—e.g., opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

158. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

159. Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

160. The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor and protect Class Members from the risk of identity theft resulting from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiff and Class Members would not need to bear, but for Defendant's failure to safeguard their Private Information.

**5. Loss of the Benefit of the Bargain**

161. Furthermore, Defendant's poor data security deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to have their information maintained by Defendant through their use of Defendant's Clients' services, Plaintiff and other reasonable individuals understood and expected that they were, in part, paying for services that included necessary data security to protect the Private Information when, in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant's Clients.

## CLASS ACTION ALLEGATIONS

162. Plaintiff brings this class action on behalf of herself and all other similarly situated individuals under Federal Rule of Civil Procedure 23, on behalf of the following class (the "Class" or "Nationwide Class"):

> All individuals in the United States whose Private Information was accessed and/or acquired by an unauthorized party as a result of the Data Breach that Defendant discovered on or about January 13, 2025, and for which Defendant issued notices beginning on or about October 24, 2025.

163. Plaintiff also brings this class action on behalf of herself and all other similarly situated individuals under Federal Rule of Civil Procedure 23, on behalf of the following subclass (the "Ohio Subclass"):

> All natural persons residing in Ohio whose Private Information was accessed and/or acquired by an unauthorized party as a result of the

Data Breach that Defendant discovered on or about January 13, 2025, and for which Defendant issued notices beginning on or about October 24, 2025.

164. Specifically excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns. Also excluded from the Class are any judges, justices, or judicial officers presiding over this matter and the members of their immediate families and judicial staff.

165. Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

166. This action may be certified as a class action because it satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23.

167. **Numerosity.** The Class is so numerous that joinder of all Class Members is impracticable. Upon information and belief, the Class is comprised of approximately 10,515,849 individuals. The precise number of Class Members and their identities are known to Defendant and can be determined through Defendant's records. Class Members may be notified of the pendency of this action by

recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

168. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court.

169. **Commonality.** Common legal and factual questions exist that predominate over any questions affecting only individual Class Members. These common questions, which do not vary among Class Members and which may be determined without reference to any Class Member's individual circumstances, include, but are not limited to:

a) Whether Defendant owed a legal duty to Plaintiff and Class Members to exercise reasonable care in collecting, storing, using, and safeguarding their Private Information;

b) Whether Defendant owed a legal duty to Plaintiff and Class Members to timely disclose that their Private Information had been compromised as a result of the Data Breach and to disclose the specific types of information compromised;

c) Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information compromised in the Data Breach;

d) Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws, regulations, and industry standards;

e) Whether Defendant's storage of Plaintiff's and Class Members' Private Information was done in a negligent manner;

f) Whether Defendant breached its duties to Plaintiff and Class Members by failing to adequately protect their Private Information;

g) Whether Defendant's conduct was negligent;

h) Whether Defendant knew or should have known that its data systems and security practices were inadequate to safeguard the Private Information of Plaintiff and Class Members;

i) Whether Defendant's conduct violated Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45;

j) Whether Defendant's conduct violated the Health Insurance Portability and Accountability Act (HIPAA) and the Health Information Technology for Economic and Clinical Health Act (HITECH);

k) Whether Defendant violated Plaintiff's and Class Members' privacy rights;

l) Whether Defendant failed to provide timely and adequate notice of the Data Breach to Plaintiff and Class Members;

m) Whether Defendant took sufficient steps to secure the Private Information of Plaintiff and Class Members;

n) Whether Defendant was unjustly enriched by its collection and use of Plaintiff's and Class Members' Private Information while failing to adequately secure that information;

o) Whether Plaintiff and Class Members are entitled to actual, compensatory, statutory, or other forms of damages and other monetary relief;

p) Whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to injunctive relief, restitution, and disgorgement;

q) Whether Defendant should be required to implement and maintain enhanced security monitoring and logging, including but not limited to Security Information and Event Management (SIEM);

r) Whether Defendant should be required to engage third-party security auditors and internal personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis;

s) Whether Defendant should be required to encrypt and anonymize Private Information in its possession;

t) Whether Defendant should be required to implement data minimization and deletion policies;

u) Whether Defendant should be required to implement adequate access controls and multi-factor authentication;

v) Whether Defendant should be required to segment its systems to prevent lateral movement by attackers;

w) Whether Defendant should be required to provide credit monitoring and identity theft protection services to Plaintiff and Class Members; and

x) The nature and extent of relief, including damages and equitable relief, to which Plaintiff and Class Members are entitled.

170. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff, like all Class Members, had his Private Information compromised as a result of the Data Breach.

171. Plaintiff is a member of the Class, and his claims arise from the same events, practices, and course of conduct that give rise to the claims of all other Class Members.

172. The harm suffered by Plaintiff is typical of the harm suffered by all other Class Members, which was caused by the same wrongful conduct by Defendant.

173. Plaintiff's claims are based upon the same legal theories as those of the other Class Members.

174. Plaintiff will fairly and adequately protect the interests of the Class Members and has retained competent counsel experienced in class action litigation.

175. **Adequacy of Representation.** Plaintiff is an adequate class representative because she is a Class Member and his interests do not conflict with the interests of the Class she seeks to represent.

176. Plaintiff will fairly and adequately represent and protect the interests of the Class, as she is committed to vigorously litigating this matter and has retained experienced and competent class action counsel to do so.

177. Plaintiff has no interests antagonistic to, or in conflict with, the Class.

178. Plaintiff has retained competent counsel who are highly experienced in complex class action litigation and data breach litigation, and who will prosecute this action vigorously.

179. Plaintiff and his counsel are committed to prosecuting this action and have the financial resources to do so. Neither Plaintiff nor his counsel has interests adverse to or in conflict with those of the Class.

180. **Predominance and Superiority.** The questions of law and fact common to the Class Members predominate over any questions affecting only individual Class Members. The common legal and factual questions outlined above do not vary among Class Members, and they may be determined without reference to the individual circumstances of any Class Member.

181. Defendant has engaged in a common course of conduct toward Plaintiff and Class Members in that all of Plaintiff's and Class Members' data was stored on the same computer system and network maintained by Defendant. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues.

182. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

183. **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

184. Because the monetary damages suffered by individual Class Members may be relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein individually.

185. Even if Class Members could afford individual litigation, the court system could not. It would be unduly burdensome to the courts if thousands of

individual cases were filed. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the legal and factual issues of this case.

186. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

187. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues and benefits, or will otherwise escape liability for its wrongdoing as asserted herein.

188. Individual litigation also presents the potential for inconsistent or contradictory judgments, the prospect of a race to the courthouse, and the risk of an inequitable allocation of recovery among those with equally meritorious claims.

189. Class treatment will avoid the significant risk that adjudications with respect to individual Class Members, as a practical matter, would be dispositive of the interests of other Class Members not parties to such adjudications or would substantially impair or impede their ability to protect their interests.

190. Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. Class treatment of common questions of law and fact would also be superior to

multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

191. **Declaratory and Injunctive Relief.** The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Defendant.

192. Such individual actions would create a risk of adjudications that would be dispositive of the interests of other Class Members not parties to those actions and would substantially impair or impede their ability to protect their interests.

193. Defendant has acted and/or refused to act on grounds generally applicable to the Class, making final injunctive relief and corresponding declaratory relief appropriate with respect to the Class as a whole.

194. Final injunctive relief and corresponding declaratory relief is appropriate because Defendant's data security practices remain deficient, the Private Information of Plaintiff and Class Members remains in Defendant's custody and control and is at risk of further disclosure, and Plaintiff and Class Members lack an adequate remedy at law.

195. **Information and Notice.** Information concerning the extent of the Class is available from Defendant's records. Defendant has access to Class Members' names and addresses contained in its files and can identify Class Members easily and accurately.

196. Individual questions, if any, are not prevalent in this case and are far outweighed by the numerous common questions that dominate this action.

197. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, published notice, and/or other methods approved by the Court.

198. Plaintiff also seeks relief under Federal Rule of Civil Procedure 23(b)(2) because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making final injunctive relief or corresponding declaratory relief appropriate with respect to the Class as a whole.

199. Monetary damages alone would be insufficient to fully remedy the harms suffered by Plaintiff and Class Members because:

a) Defendant continues to possess their Private Information;

b) Defendant's data security practices remain inadequate;

c) The risk of future breaches and further disclosure of their Private Information remains;

d) The stolen Private Information is now in the hands of criminals and cannot be retrieved;

e) The immutable nature of the compromised information (particularly Social Security numbers and dates of birth) creates lifelong risks that cannot be fully remedied with monetary damages alone; and

f) Only injunctive relief requiring Defendant to implement and maintain adequate security measures can protect Plaintiff and Class Members from future harm.

200. Accordingly, injunctive relief is necessary and appropriate to:

a) Require Defendant to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the Private Information in its possession;

b) Require Defendant to engage third-party security auditors to conduct regular testing, penetration tests, and audits of Defendant's systems;

c) Require Defendant to encrypt and anonymize Private Information;

d) Require Defendant to implement adequate access controls, multi-factor authentication, and network segmentation;

e) Require Defendant to implement data minimization and deletion practices;

f) Require Defendant to provide lifetime credit monitoring and identity theft protection services to Plaintiff and Class Members;

g) Require Defendant to submit to ongoing monitoring and reporting regarding its data security practices; and

h) Provide such other injunctive relief as may be necessary to protect the interests of Plaintiff and Class Members.

## CLAIMS FOR RELIEF

### COUNT ONE
### NEGLIGENCE
### On behalf of Plaintiff and the Class

201. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

202. Defendant owed Plaintiff and Class Members a duty to exercise reasonable care in collecting, storing, using, safeguarding, and protecting their Private Information from unauthorized access, disclosure, theft, and misuse.

203. This duty arose from multiple sources, including:

a) Special Relationship: Plaintiff and Class Members entrusted their Private Information to Defendant with the mutual understanding that Defendant would maintain it securely and confidentially. Defendant

solicited, collected, and used this information for its own financial benefit and held itself out as capable of protecting it;

b) Exclusive Control: Defendant had exclusive control over its systems, networks, and security protocols. Only Defendant could protect the Private Information stored on its systems from cyberattacks. Plaintiff and Class Members had no ability to protect their own information once entrusted to Defendant;

c) Foreseeability: Plaintiff and Class Members were foreseeable victims of Defendant's inadequate data security practices. Defendant knew or should have known that:

   i. Healthcare entities are prime targets for cybercriminals due to the high value of medical and personal information;

   ii. Data breaches targeting healthcare information were increasing in frequency and severity;

   iii. A breach of its systems would result in substantial harm to individuals whose information was compromised;

   iv. The Private Information at issue—including Social Security numbers, dates of birth, and health information—is immutable and creates lifelong risks when compromised; and

v. The failure to implement reasonable security measures would likely result in unauthorized access;

d) Industry Standards and Regulatory Guidance: Defendant's duty was informed and established by:

i. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits unfair practices including the failure to implement reasonable data security measures;

ii. FTC guidelines requiring businesses to implement appropriate administrative, physical, and technical safeguards;

iii. HIPAA Security Rule requirements applicable to business associates, including 45 C.F.R. §§ 164.306, 164.308, 164.310, and 164.312;

iv. HITECH Act obligations, 42 U.S.C. § 17921 et seq.;

v. NIST Cybersecurity Framework and other recognized industry standards; and

vi. Common practices and standards within the healthcare data processing industry.

204. Defendant's duties included, but were not limited to:

a) Implementing and maintaining reasonable administrative, technical, and physical safeguards to protect Private Information;

b) Encrypting Private Information, particularly when stored or transmitted electronically;

c) Implementing adequate access controls to ensure that only authorized personnel could access Private Information;

d) Implementing adequate intrusion detection and prevention systems to identify and stop unauthorized access;

e) Monitoring its systems for suspicious activity and responding promptly to security alerts;

f) Training employees and contractors on data security protocols and the importance of protecting Private Information;

g) Conducting regular security assessments, audits, and penetration testing to identify and remediate vulnerabilities;

h) Implementing network segmentation to prevent lateral movement by attackers;

i) Maintaining adequate logging and audit trails to detect and investigate security incidents;

j) Implementing data minimization practices to retain only necessary information;

k) Timely detecting security breaches and containing any intrusions;

l) Providing timely, accurate, and complete notice to affected individuals in the event of a breach, including specific information about what data was compromised; and

m) Complying with applicable federal and state laws, regulations, and industry standards governing data security and breach notification.

205. Defendant breached its duties to Plaintiff and Class Members by failing to exercise reasonable care in safeguarding their Private Information.

206. Defendant's breaches include, but are not limited to:

a) Failing to implement adequate encryption for Private Information stored on its systems;

b) Failing to implement adequate access controls, including multi-factor authentication;

c) Failing to implement adequate intrusion detection and prevention systems;

d) Failing to adequately monitor its systems for suspicious activity;

e) Failing to detect the intrusion for nearly three months (October 21, 2024 to January 13, 2025);

f) Failing to prevent the exfiltration of unencrypted Private Information;

g) Failing to implement adequate network segmentation;

h) Failing to adequately train employees on data security practices;

i) Failing to conduct adequate security assessments and testing;

j) Failing to comply with applicable FTC guidelines, HIPAA Security Rule requirements, HITECH obligations, and industry standards;

k) Failing to provide timely notice of the Data Breach—waiting approximately ten months after discovery to notify affected individuals; and

l) Failing to provide complete notice of the Data Breach, including specific information about what data was compromised for each individual.

207. A reasonably prudent business in Defendant's position—particularly one holding highly sensitive health and personal information for millions of individuals—would have implemented the security measures that Defendant failed to implement.

208. Defendant's breaches of duty were the actual and proximate cause of the Data Breach and the resulting harm to Plaintiff and Class Members.

209. But for Defendant's failure to implement reasonable security measures, the Data Breach would not have occurred, or its scope and duration would have been substantially limited. Specifically:

a) Had Defendant encrypted the Private Information, it would have been unusable to the unauthorized actors even if accessed;

b) Had Defendant implemented adequate intrusion detection and monitoring, the breach would have been detected and stopped much sooner than three months;

c) Had Defendant implemented adequate access controls and network segmentation, the unauthorized actors' ability to access and exfiltrate data would have been prevented or substantially limited; and

d) Had Defendant provided timely notification, Plaintiff and Class Members could have taken earlier protective measures to mitigate harm.

210. The harm suffered by Plaintiff and Class Members was a natural, probable, and foreseeable consequence of Defendant's breaches. Defendant knew or should have known that:

a) Healthcare entities are frequent targets of cyberattacks;

b) The failure to implement reasonable security measures would likely result in a data breach;

c) A data breach involving Social Security numbers, dates of birth, and health information would result in substantial harm to affected individuals;

d) Stolen Private Information would be sold on the dark web and used for identity theft, medical identity theft, fraud, and other criminal purposes;

e) Victims would incur time and expenses to mitigate the harm; and

f) Delayed notification would exacerbate these harms by preventing victims from taking timely protective action.

211. There are no intervening or superseding causes that break the causal chain between Defendant's negligence and Plaintiff's and Class Members' injuries. The criminal conduct of third-party hackers does not excuse Defendant's negligence, as such attacks were the precise risk that Defendant's duty was designed to prevent.

212. As a direct and proximate result of Defendant's negligence, Plaintiff and Class Members have suffered and will continue to suffer actual damages, including but not limited to:

a) The unauthorized access, acquisition, and theft of their Private Information, including loss of confidentiality and privacy;

b) Imminent, substantial, and ongoing risk of identity theft, medical identity theft, tax fraud, loan fraud, government benefits fraud, and other misuse of their Private Information;

c) For those Class Members who have already experienced fraudulent use of their information;

d) Costs incurred and to be incurred for:

   i. Credit monitoring and identity theft protection services;

   ii. Credit freezes and fraud alerts;

   iii. Credit reports;

   iv. Time spent monitoring accounts, credit reports, and medical records;

   v. Costs to remediate fraudulent charges or accounts;

   vi. Professional services to address identity theft;

e) Hours spent researching the breach, reviewing financial and medical accounts, monitoring credit reports, placing fraud alerts and credit freezes, changing passwords, contacting financial institutions, and otherwise responding to and mitigating the breach;

f) Loss of the value of their Private Information, which is valuable property that now has diminished worth due to its compromise and publication;

g) Intrusion into their private health and personal information;

h) Loss of the benefit of their bargain in that they paid for services that included adequate data security but received services with inadequate security;

i) Anxiety, stress, fear, worry, and emotional distress caused by the Data Breach and the ongoing risk of identity theft and fraud; and

j) The need for ongoing monitoring and vigilance for years or decades into the future, as the compromised information (particularly Social Security numbers and health information) cannot be changed and creates lifelong risks.

213. Plaintiff and Class Members have suffered ascertainable losses and are entitled to compensatory and consequential damages in an amount to be proven at trial.

214. Defendant's conduct demonstrates a reckless disregard for the rights and safety of Plaintiff and Class Members, justifying an award of punitive damages to punish Defendant and deter similar conduct.

215. Plaintiff and Class Members have no adequate remedy at law. Monetary damages alone cannot adequately compensate them because the stolen Private Information remains in the possession of criminals and cannot be retrieved, while Defendant continues to possess their Private Information and has not demonstrated that its security practices have been adequately remediated.

Moreover, the risk of future misuse of their Private Information—particularly the immutable identifiers such as Social Security numbers and health information—is ongoing and cannot be fully remedied with money. Only prospective injunctive relief requiring Defendant to implement and maintain adequate security measures can protect Plaintiff and Class Members from continued and future harm.

216. Plaintiff and Class Members are entitled to injunctive relief requiring Defendant to implement and maintain reasonable security measures, including but not limited to:

a) Engaging independent third-party security auditors to conduct regular penetration testing and security audits;

b) Encrypting all Private Information stored on Defendant's systems;

c) Implementing adequate access controls, including multi-factor authentication;

d) Implementing adequate intrusion detection, prevention, and monitoring systems;

e) Implementing network segmentation;

f) Conducting regular employee training on data security;

g) Implementing data minimization and retention policies;

h) Providing lifetime credit monitoring and identity theft protection services to Plaintiff and Class Members; and

i) Submitting to ongoing monitoring and reporting regarding the implementation and maintenance of these security measures.

**COUNT TWO**
**NEGLIGENCE *PER SE***
**On behalf of Plaintiff and the Class**

217. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

218. This claim is pleaded in the alternative to Count I.

219. Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce."

220. The FTC has interpreted and enforced Section 5 to prohibit the unfair act or practice of failing to employ reasonable measures to protect consumers' personal information. The failure to implement reasonable data security measures to protect sensitive personal information constitutes an unfair practice under Section 5.

221. The FTC has established that businesses collecting and storing consumers' personal information must, at a minimum:

a) Implement reasonable administrative, technical, and physical safeguards to protect personal information;

b) Assess and address security risks through regular risk assessments;

c) Implement data security policies and procedures commensurate with the sensitivity of the data;

d) Encrypt sensitive personal information;

e) Implement access controls and authentication measures;

f) Monitor systems for unauthorized intrusions;

g) Train personnel on data security practices;

h) Maintain and test security measures and update them as necessary;

i) Ensure that third parties with access to personal information maintain reasonable security measures; and

j) Investigate and respond appropriately to security incidents.

222. The FTC has brought enforcement actions against entities, including healthcare service providers and business associates, for failing to implement reasonable data security measures in violation of Section 5. See, e.g., In the Matter of LabMD, Inc., 2016-2 Trade Cas. (CCH) 79708, 2016 WL 4128215 (FTC July 28, 2016) (finding that a clinical laboratory's data security practices were unreasonable and constituted an unfair act or practice in violation of Section 5).

223. Defendant violated Section 5 of the FTC Act by failing to implement reasonable and appropriate data security measures to protect Plaintiff's and Class Members' Private Information, including by:

a) Failing to encrypt Private Information stored on its systems;

b) Failing to implement adequate access controls and multi-factor authentication;

c) Failing to implement adequate intrusion detection and prevention systems;

d) Failing to adequately monitor its systems for unauthorized access;

e) Allowing unauthorized access to persist for nearly three months without detection;

f) Failing to prevent the exfiltration of Private Information;

g) Failing to implement network segmentation;

h) Failing to adequately train personnel on data security;

i) Failing to conduct regular security assessments and penetration testing; and

j) Failing to maintain security measures commensurate with the volume and sensitivity of the Private Information in its possession.

224. Defendant is a "business associate" as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 45 C.F.R. § 160.103, because it creates, receives, maintains, or transmits protected health information on behalf of covered entities (health plans and healthcare providers).

225. As a business associate, Defendant is directly subject to and required to comply with the HIPAA Security Rule, 45 C.F.R. Part 160 and Part 164,

Subparts A and C, which establishes national standards for protecting health information that is kept or transferred in electronic form.

226. The Health Information Technology for Economic and Clinical Health Act ("HITECH"), 42 U.S.C. § 17921 et seq., and 45 C.F.R. § 160.103, extended HIPAA's Security Rule requirements directly to business associates.

227. The HIPAA Security Rule requires that Defendant:

a) "Ensure the confidentiality, integrity, and availability of all electronic protected health information the . . . business associate creates, receives, maintains, or transmits," 45 C.F.R. § 164.306(a)(1);

b) "Protect against any reasonably anticipated threats or hazards to the security or integrity of such information," 45 C.F.R. § 164.306(a)(2);

c) "Protect against any reasonably anticipated uses or disclosures of such information that are not permitted," 45 C.F.R. § 164.306(a)(3);

d) "Ensure compliance by its workforce," 45 C.F.R. § 164.306(a)(4);

e) "Implement policies and procedures to prevent, detect, contain, and correct security violations," 45 C.F.R. § 164.308(a)(1)(i);

f) "Implement procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports," 45 C.F.R. § 164.308(a)(1)(ii)(D);

g) "Implement a mechanism to encrypt and decrypt electronic protected health information," 45 C.F.R. § 164.312(a)(2)(iv);

h) "Implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights," 45 C.F.R. § 164.312(a)(1);

i) "Implement procedures to verify that a person or entity seeking access to electronic protected health information is the one claimed," 45 C.F.R. § 164.312(d);

j) "Implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network," 45 C.F.R. § 164.312(e)(1); and

k) "Review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information," 45 C.F.R. § 164.306(e).

228. Defendant violated the HIPAA Security Rule and HITECH Act by failing to comply with these requirements, including by:

a) Failing to ensure the confidentiality, integrity, and availability of electronic protected health information;

b) Failing to protect against reasonably anticipated threats to the security of such information;

c) Failing to protect against reasonably anticipated unauthorized disclosures;

d) Failing to implement adequate policies and procedures to prevent, detect, contain, and correct security violations;

e) Failing to implement adequate audit controls and to regularly review system activity logs;

f) Failing to implement adequate encryption mechanisms for electronic protected health information;

g) Failing to implement adequate access controls;

h) Failing to implement adequate authentication procedures;

i) Failing to implement adequate transmission security measures;

j) Failing to conduct regular security risk assessments as required by 45 C.F.R. § 164.308(a)(1)(ii)(A); and

k) Failing to review and modify security measures as needed.

229. Section 5 of the FTC Act was enacted to protect consumers, including Plaintiff and Class Members, from unfair and deceptive practices, including the

failure to reasonably protect their personal information from unauthorized disclosure and misuse.

230. The HIPAA Security Rule and HITECH Act were enacted to protect individuals, including Plaintiff and Class Members, whose protected health information is created, received, maintained, or transmitted by covered entities and business associates, and to establish national standards for securing such information against unauthorized access, use, and disclosure.

231. Plaintiff and Class Members are within the class of persons that these statutes were intended to protect—individuals whose personal information and protected health information are collected, maintained, and used by businesses and healthcare entities.

232. The unauthorized access, acquisition, theft, and disclosure of personal information and protected health information, and the resulting harms including identity theft, fraud, loss of privacy, and economic harm, are precisely the types of harm that Section 5 of the FTC Act and the HIPAA Security Rule and HITECH Act were designed to prevent.

233. The FTC has repeatedly emphasized that the purpose of requiring reasonable data security measures is to prevent the unauthorized access and disclosure of consumers' personal information and the resulting harms from identity theft and fraud.

234. The Department of Health and Human Services has repeatedly emphasized that the purpose of the HIPAA Security Rule is to protect the confidentiality, integrity, and availability of electronic protected health information and to prevent unauthorized access, use, and disclosure that could harm individuals.

235. Defendant's violations of Section 5 of the FTC Act and the HIPAA Security Rule and HITECH Act were the actual and proximate cause of the Data Breach and the harm suffered by Plaintiff and Class Members.

236. Had Defendant complied with its obligations under these statutes—including implementing encryption, adequate access controls, intrusion detection systems, monitoring, and regular security assessments—the Data Breach would not have occurred, or its scope and duration would have been substantially limited.

237. The harm suffered by Plaintiff and Class Members, including the theft of their Private Information and the resulting risks of identity theft and fraud, was the natural, probable, and foreseeable consequence of Defendant's statutory violations and was precisely the type of harm these statutes were designed to prevent.

238. As a direct and proximate result of Defendant's violations of Section 5 of the FTC Act and the HIPAA Security Rule and HITECH Act, Plaintiff and Class

Members have suffered and will continue to suffer actual damages, including the theft and compromise of their Private Information; imminent and substantial risk of identity theft, medical identity theft, fraud, and other misuse of their Private Information; out-of-pocket expenses for credit monitoring, identity theft protection, fraud alerts, and credit freezes; lost time spent monitoring accounts and responding to the breach; diminution in value of their Private Information; loss of privacy; loss of the benefit of their bargain; emotional distress including anxiety, stress, and fear; and the need for ongoing monitoring and vigilance for years into the future.

239. Plaintiff and Class Members are entitled to compensatory damages, consequential damages, and such other relief as the Court deems appropriate.

240. Plaintiff and Class Members are entitled to injunctive relief requiring Defendant to comply with Section 5 of the FTC Act and the HIPAA Security Rule and HITECH Act by implementing and maintaining the security measures required by these statutes, including those measures set forth in paragraph 212.

**COUNT THREE**
**BREACH OF THIRD-PARTY BENEFICIARY CONTRACT**
**On behalf of Plaintiff and the Class**

241. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

242. Defendant entered into written contracts, including Business Associate Agreements ("BAAs") required by HIPAA, with its clients, including health insurance plans such as Blue Cross and Blue Shield of Illinois and other entities (collectively, "Clients"), pursuant to which Defendant agreed to provide business services including claims processing, payment integrity, health plan administration, and other services requiring access to and maintenance of protected health information.

243. Upon information and belief, these contracts are substantially similar among Defendant's various Clients whose members, including Plaintiff and Class Members, were affected by the Data Breach.

244. These contracts remain valid and enforceable.

245. The contracts between Defendant and its Clients were made expressly for the benefit of the patients, members, and insureds of Defendant's Clients—including Plaintiff and Class Members—whose Private Information would be provided to, maintained by, and processed by Defendant.

246. Plaintiff and Class Members are intended third-party beneficiaries, not merely incidental beneficiaries, of these contracts because:

a) The contracts expressly required Defendant to implement and maintain safeguards to protect the confidentiality, integrity, and

availability of protected health information belonging to the Clients' members;

b) The contracts expressly required Defendant to comply with HIPAA and HITECH requirements designed to protect individuals' protected health information;

c) The protection of Plaintiff's and Class Members' Private Information was a primary, direct, and intended purpose of the security provisions in the contracts;

d) The contracts could not be performed without benefiting Plaintiff and Class Members, as the security provisions exist solely to protect their information;

e) Defendant knew that the security obligations in the contracts were for the benefit of the individuals whose information it would handle;

f) The Clients could not adequately protect their members' information once transferred to Defendant, making the contractual security obligations essential to protecting Plaintiff and Class Members;

g) HIPAA requires that Business Associate Agreements contain specific provisions to protect individuals' protected health information, and these statutory requirements evidence the intent to benefit individuals whose information is at issue; and

h) Plaintiff and Class Members have no direct contractual relationship with Defendant and thus have no other means to enforce the security obligations Defendant assumed.

247. Recognizing Plaintiff and Class Members as intended beneficiaries effectuates the parties' intent and the purpose of the contracts, which was to ensure that individuals' highly sensitive health and personal information would be adequately protected when entrusted to Defendant.

248. Under these contracts, Defendant expressly agreed to, among other things:

a) Implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the protected health information that it creates, receives, maintains, or transmits on behalf of the Clients;

b) Comply with the applicable requirements of the HIPAA Security Rule, 45 C.F.R. Part 164, Subpart C;

c) Ensure that any agents or subcontractors to whom it provides protected health information agree to implement reasonable and appropriate safeguards to protect it;

d) Report to the Clients any security incident or breach of unsecured protected health information;

e) Implement policies and procedures to prevent, detect, contain, and correct security violations;

f) Implement procedures to regularly review records of information system activity;

g) Encrypt protected health information;

h) Implement access controls to limit access to protected health information to authorized users;

i) Implement authentication procedures;

j) Implement transmission security measures; and

k) Conduct regular security risk assessments and implement security measures sufficient to reduce risks and vulnerabilities to a reasonable and appropriate level.

249. Defendant breached these contractual obligations by failing to implement adequate encryption for Private Information stored on its systems, failing to implement adequate access controls and multi-factor authentication, failing to implement adequate intrusion detection and prevention systems, failing to adequately monitor its systems for unauthorized access, allowing unauthorized access to persist for nearly three months without detection, failing to prevent the exfiltration of unencrypted Private Information, failing to implement network segmentation to limit lateral movement by attackers, failing to conduct regular

security risk assessments, failing to review records of information system activity, and failing to adequately train personnel on data security practices.

250. Defendant further breached its contractual obligations by failing to timely detect the intrusion, failing to prevent the exfiltration of unencrypted Private Information for nearly three months, and failing to provide timely notification of the breach.

251. As intended third-party beneficiaries of these contracts, Plaintiff and Class Members have the right to enforce the security provisions for their benefit and to recover damages for Defendant's breach of those provisions.

252. As a direct and proximate result of Defendant's breach of its contractual obligations owed to Plaintiff and Class Members as third-party beneficiaries, Plaintiff and Class Members have suffered and will continue to suffer actual damages, including the theft and compromise of their Private Information; imminent and substantial risk of identity theft, medical identity theft, fraud, and other misuse of their Private Information; out-of-pocket expenses for credit monitoring, identity theft protection, fraud alerts, and credit freezes; lost time spent monitoring accounts and responding to the breach; diminution in value of their Private Information; loss of privacy; loss of the benefit of their bargain; emotional distress including anxiety, stress, and fear; and the need for ongoing monitoring and vigilance for years into the future.

253. Plaintiff and Class Members are entitled to compensatory damages, consequential damages, and such other relief as the Court deems appropriate for Defendant's breach of contract.

254. Plaintiff and Class Members are entitled to recover their reasonable attorneys' fees and costs incurred in prosecuting this action, as such fees and costs are recoverable in contract actions and/or as the Court may otherwise deem appropriate.

**COUNT FOUR**
**BREACH OF IMPLIED CONTRACT**
**On behalf of Plaintiff and the Class**

255. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

256. This claim is pleaded in the alternative to Count III.

257. In the alternative, if no express third-party beneficiary contract exists or is enforceable, Plaintiff and Class Members entered into implied contracts with Defendant.

258. Plaintiff and Class Members provided their Private Information to Defendant's Clients for the purpose of receiving healthcare services and benefits, with the understanding that such information would be transmitted to and

maintained by Defendant in the course of Defendant's provision of business services to those Clients.

259. Defendant accepted, received, and used Plaintiff's and Class Members' Private Information for its own business and financial benefit.

260. Defendant could not perform its business functions or provide services to its Clients without collecting, using, and storing the Private Information of Plaintiff and Class Members.

261. By accepting and using Plaintiff's and Class Members' Private Information, Defendant entered into implied contracts with Plaintiff and Class Members.

262. A meeting of the minds occurred between Defendant, on the one hand, and Plaintiff and Class Members, on the other hand, regarding the use and protection of Private Information.

263. Plaintiff and Class Members manifested their assent to provide their Private Information to Defendant by obtaining services from Defendant's Clients, which necessarily required that their information be provided to Defendant.

264. Defendant manifested its assent to receive and use this Private Information by accepting it, storing it, and using it for business purposes.

265. Both parties understood and agreed that Defendant would use the Private Information only for legitimate business purposes and would maintain

reasonable security measures to protect it from unauthorized access, disclosure, and misuse.

266. The implied contracts between Defendant and Plaintiff and Class Members included the following terms:

a) Defendant would use Plaintiff's and Class Members' Private Information only for legitimate business purposes in connection with providing services to Defendant's Clients;

b) Defendant would implement and maintain reasonable administrative, physical, and technical safeguards to protect the Private Information from unauthorized access, disclosure, theft, and misuse;

c) Defendant would comply with applicable federal and state laws and industry standards governing the protection of Private Information, including the FTC Act, HIPAA Security Rule, and HITECH Act;

d) Defendant would limit access to Private Information to only those employees and systems that required such access;

e) Defendant would monitor its systems for unauthorized access and respond appropriately to security incidents;

f) Defendant would maintain the confidentiality and privacy of the Private Information; and

g) Defendant would provide timely and accurate notice if the Private Information was compromised in a data breach.

267. These implied terms arose from:

a) The nature of the relationship between the parties, whereby Plaintiff and Class Members entrusted Defendant with highly sensitive personal and health information;

b) The mutual understanding that such sensitive information required protection;

c) The reasonable expectations of Plaintiff and Class Members that Defendant would adequately safeguard their information;

d) Industry standards and common practices requiring entities that collect and maintain sensitive personal and health information to implement reasonable security measures;

e) Applicable statutory and regulatory requirements governing the protection of such information; and

f) Defendant's own representations and conduct indicating that it would protect the Private Information.

268. Plaintiff and Class Members provided valuable consideration by providing their Private Information to Defendant, which is valuable property that Defendant used for its business operations and financial benefit. By entrusting

Defendant with sensitive personal and health information, Plaintiff and Class Members enabled Defendant to perform its services and generate revenue. Defendant could not provide its services to its Clients without the use of Plaintiff's and Class Members' information.

269. Defendant provided consideration by agreeing to use the Private Information only for legitimate business purposes and to implement and maintain reasonable security measures to protect it.

270. Plaintiff and Class Members fully performed their obligations under the implied contracts by providing their Private Information to Defendant and allowing Defendant to use it for business purposes.

271. Defendant breached the implied contracts by failing to implement and maintain reasonable security measures to protect Plaintiff's and Class Members' Private Information, including by failing to encrypt Private Information, failing to implement adequate access controls and multi-factor authentication, failing to implement adequate intrusion detection and monitoring systems, allowing unauthorized access to persist for nearly three months without detection, failing to prevent the exfiltration of unencrypted data, failing to implement network segmentation, and failing to adequately train personnel on data security practices.

272. Defendant further breached the implied contracts by failing to comply with applicable laws and industry standards, failing to maintain confidentiality of the Private Information, and failing to provide timely notice of the Data Breach.

273. As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members have suffered and will continue to suffer actual damages, including the theft and compromise of their Private Information; imminent and substantial risk of identity theft, medical identity theft, fraud, and other misuse of their Private Information; out-of-pocket expenses for credit monitoring, identity theft protection, fraud alerts, and credit freezes; lost time spent monitoring accounts and responding to the breach; diminution in value of their Private Information; loss of privacy; loss of the benefit of their bargain; emotional distress including anxiety, stress, and fear; and the need for ongoing monitoring and vigilance for years into the future.

274. Had Plaintiff and Class Members known that Defendant would not adequately protect their Private Information or would breach its obligations under the implied contracts, they would not have allowed their information to be provided to and maintained by Defendant.

275. Plaintiff and Class Members are entitled to compensatory damages, consequential damages, restitution, and such other relief as the Court deems appropriate for Defendant's breach of contract.

**COUNT FIVE**
**UNJUST ENRICHMENT**
**On behalf of Plaintiff and the Class**

276. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

277. This claim is pleaded in the alternative to Counts III and IV, to the extent that no enforceable express or implied contract exists between the parties.

278. Plaintiff and Class Members conferred substantial benefits upon Defendant by providing their Private Information to Defendant for use in Defendant's business operations.

279. Defendant's entire business model depends upon obtaining, maintaining, and using the Private Information of Plaintiff and Class Members. Without this information, Defendant could not perform its services for its Clients or generate revenue.

280. The Private Information provided by Plaintiff and Class Members is valuable property that has significant market value in both legitimate and illicit markets. Defendant obtained this valuable property at no direct cost from Plaintiff and Class Members.

281. Plaintiff and Class Members also conferred financial benefits upon Defendant through payments made by or on behalf of Plaintiff and Class Members

to Defendant's Clients for services, a portion of which payments were passed on to Defendant as compensation for its business services. These payments included amounts allocated for data security to protect Private Information.

282. Defendant derived substantial economic benefit from collecting, using, and maintaining Plaintiff's and Class Members' Private Information, enabling Defendant to provide services to its Clients and generate significant revenue.

283. Defendant accepted and retained these benefits by collecting, storing, and using Plaintiff's and Class Members' Private Information for its business operations and financial gain.

284. Defendant knew that Plaintiff and Class Members conferred these benefits upon it and that Defendant's business operations and profitability depended upon receiving and using this Private Information.

285. Defendant has retained the benefits of using Plaintiff's and Class Members' Private Information while failing to provide the data security that Plaintiff and Class Members reasonably expected and that industry standards and applicable laws required.

286. It would be unjust and inequitable for Defendant to retain these benefits without adequately compensating Plaintiff and Class Members because

Defendant failed to provide the data security protections that were necessary, expected, and legally required.

287. Defendant enriched itself by failing to invest adequate resources in data security measures. Rather than implementing reasonable and industry-standard security measures including encryption, adequate access controls, intrusion detection systems, monitoring, network segmentation, and regular security assessments, Defendant chose to prioritize its own profits at the expense of Plaintiff's and Class Members' security and safety.

288. The amounts that Defendant should have expended on adequate data security but instead retained for its own benefit represent unjust enrichment.

289. Defendant's retention of these benefits is unjust because Plaintiff and Class Members did not receive the adequate data security they reasonably expected and that was necessary to protect their highly sensitive Private Information. Had Plaintiff and Class Members known that Defendant would not adequately protect their Private Information, they would not have allowed their information to be provided to and maintained by Defendant.

290. Under principles of equity and good conscience, Defendant should not be permitted to retain money and benefits that were obtained based on the understanding that Defendant would implement adequate data security measures, when in fact Defendant failed to do so.

291. The circumstances make it unjust for Defendant to retain the benefits without paying their value to Plaintiff and Class Members, particularly where Defendant's inadequate security measures resulted in the compromise of their Private Information and caused them substantial harm.

292. Plaintiff and Class Members have no adequate remedy at law because they cannot obtain restitution of the benefits unjustly retained by Defendant through other legal theories, and monetary damages alone cannot adequately address Defendant's unjust enrichment.

293. Plaintiff and Class Members are entitled to restitution and disgorgement of all benefits, revenues, and compensation unjustly obtained and retained by Defendant, including amounts that should have been spent on adequate data security but were instead retained as profit.

294. Plaintiff and Class Members seek the establishment of a constructive trust or other equitable remedy from which they may seek restitution and compensation for Defendant's unjust enrichment.

295. Plaintiff and Class Members are also entitled to compensatory damages for the harm they suffered as a result of Defendant's unjust enrichment, including the theft and compromise of their Private Information, increased risk of identity theft and fraud, out-of-pocket mitigation expenses, lost time, diminution in

value of their Private Information, loss of privacy, emotional distress, and the need for ongoing monitoring.

**COUNT SIX**
**INVASION OF PRIVACY – INTRUSION UPON SECLUSION**
**On behalf of Plaintiff and the Class**

296. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

297. Plaintiff and Class Members had a reasonable expectation of privacy in their Private Information, including their names, addresses, dates of birth, Social Security numbers, medical information, health insurance information, and other protected health information.

298. This Private Information is highly sensitive, personal, and confidential. It includes intimate details about Plaintiff's and Class Members' health conditions, medical treatments, diagnoses, and other matters concerning their private lives that are not of legitimate public concern.

299. Social Security numbers are unique identifiers that individuals are required to keep confidential and that are used to access financial accounts, government benefits, and other sensitive systems. Plaintiff and Class Members took reasonable steps to maintain the confidentiality of their Social Security numbers and other Private Information.

300. Medical and health information is among the most sensitive and private categories of personal information, protected by federal and state privacy laws including HIPAA, which recognizes individuals' fundamental privacy interests in their health information.

301. Plaintiff and Class Members entrusted their Private Information to Defendant with the express understanding and reasonable expectation that Defendant would maintain it in strict confidence and would protect it from unauthorized access and disclosure.

302. A reasonable person in Plaintiff's and Class Members' position would expect that such sensitive personal and health information would be kept private and would not be accessible to unauthorized third parties or disclosed to the public.

303. Defendant intentionally or recklessly intruded upon Plaintiff's and Class Members' privacy by knowingly failing to implement reasonable security measures to protect their Private Information, despite knowing that such failures would result in unauthorized access to and disclosure of that information.

304. Defendant knew or should have known that its inadequate security practices would lead to unauthorized access to Plaintiff's and Class Members' Private Information. Despite this knowledge and despite repeated warnings about the targeting of healthcare entities and the importance of data security, Defendant recklessly disregarded the privacy interests of Plaintiff and Class Members.

305. Defendant's conduct was intentional or reckless because Defendant made conscious decisions about how much to invest in data security measures, knew that its security measures were inadequate, knew that healthcare entities were frequent targets of cyberattacks, knew that a breach was likely to occur, and yet chose not to implement adequate security measures including encryption, adequate access controls, intrusion detection, monitoring, and network segmentation.

306. Defendant's intentional or reckless conduct resulted in unauthorized third parties gaining access to Defendant's systems and obtaining Plaintiff's and Class Members' Private Information for nearly three months without detection.

307. The unauthorized access and exfiltration of Plaintiff's and Class Members' Private Information constitutes an intrusion into their private affairs and seclusion. This intrusion allowed unauthorized criminals to view, obtain, and misuse intimate details about Plaintiff's and Class Members' identities, finances, and health.

308. Defendant further intruded upon Plaintiff's and Class Members' privacy by intentionally or recklessly delaying notification of the breach for approximately ten months after discovery, thereby prolonging the unauthorized exposure of their Private Information and depriving them of the ability to take timely protective measures.

309. The intrusion into Plaintiff's and Class Members' Private Information would be highly offensive and objectionable to a reasonable person of ordinary sensibilities.

310. A reasonable person would find it highly offensive that their Social Security number—a unique and permanent identifier used to access financial accounts, government benefits, and other sensitive systems—was accessible to and obtained by criminals due to inadequate security measures.

311. A reasonable person would find it highly offensive that intimate details about their health conditions, medical treatments, diagnoses, and health insurance were accessible to and obtained by unauthorized third parties who have no legitimate reason to access such information and who intend to use it for criminal purposes.

312. A reasonable person would find it highly offensive that their Private Information was inadequately protected despite being entrusted to an entity that held itself out as capable of safeguarding such information and despite federal and state laws requiring adequate protection of such information.

313. A reasonable person would find it highly offensive that such sensitive information remains in the hands of criminals, has been or will be published on the dark web, and will be used for identity theft, medical identity theft, fraud, and other criminal purposes, causing ongoing harm that may last for years or decades.

314. The highly offensive nature of this intrusion is evidenced by the fact that federal law recognizes the sensitivity of health information through HIPAA, numerous states have enacted laws protecting the privacy of personal information, and society generally recognizes a strong interest in maintaining the confidentiality of medical and personal information.

315. Defendant knew or should have known that a reasonable person in Plaintiff's and Class Members' position would consider Defendant's intentional or reckless actions and the resulting unauthorized access to their Private Information to be highly offensive and objectionable.

316. As a direct and proximate result of Defendant's intrusion upon their privacy, Plaintiff and Class Members have suffered and will continue to suffer actual harm and damages. The unauthorized access to and disclosure of their Private Information has caused them to suffer loss of privacy, loss of control over their most sensitive personal and health information, emotional distress, anxiety, fear, worry, embarrassment, and humiliation.

317. Plaintiff and Class Members have been forced to take time-consuming and costly steps to protect themselves from the consequences of the privacy intrusion, including monitoring their accounts and credit reports, placing fraud alerts and credit freezes, changing passwords, and remaining vigilant against identity theft and fraud.

318. The intrusion has created ongoing fear and anxiety about the potential misuse of their Private Information, particularly given that Social Security numbers and health information cannot be changed and the stolen information will remain available to criminals indefinitely.

319. The intrusion has caused Plaintiff and Class Members to suffer the knowledge that intimate details about their health and personal lives are now in the possession of criminals and may be publicly disclosed or used in ways that could cause further embarrassment, harm to reputation, or other damages.

320. A reasonable person of ordinary sensibilities would experience substantial mental suffering, shame, humiliation, and outrage as a result of such an intrusion into their private health and personal information.

**COUNT SEVEN**
**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**
**N.J.S.A. 56:8-1, *et seq*.**
**On Behalf of Plaintiff and the Ohio Subclass**

321. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

322. The Consumer Fraud Act (CFA), at N.J.S.A. 56:8-2, prohibits "[t]he act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise [or]

misrepresentation… in connection with the sale or advertisement of any merchandise… or with the subsequent performance."

323. The plain language of the CFA does not require privity between "any person" who violates the Act and the "any person" who suffers "ascertainable loss…as a result of" the violation.

324. Under CFA precedents, a sellers' violation of their legal duties under other laws can constitute and serve as evidence of an abusive or unconscionable commercial practice under N.J.S.A. 56:8-2.

325. Defendant is a "person" within the meaning of the New Jersey Consumer Fraud Act ("NJCFA"), N.J.S.A. 56:8-1(d). Defendant, directly and through its agents, engaged in the sale and advertisement of "merchandise," including services provided to and for the benefit of consumers, within the meaning of N.J.S.A. 56:8-1(c). The acts and practices alleged herein occurred "in connection with" the sale or advertisement of merchandise and/or the subsequent performance of such services.

326. Defendant has engaged in unlawful practices declared unlawful by N.J.S.A. 56:8-2, including but not limited to unconscionable commercial practices, deception, misrepresentations, false promises, and the knowing concealment, suppression, or omission of material facts with the intent that others rely on such concealment, suppression, or omission. Among other things, Defendant

represented—expressly and by implication—that it provided services that conformed to applicable legal, regulatory, industry, and contractual requirements and that were accompanied by reasonable and adequate safeguards, controls, and oversight to protect consumers and their interests, when, in fact, Defendant failed to disclose and/or misrepresented material facts concerning the nature, quality, adequacy, and security of those services, the attendant risks to consumers, and the material deficiencies in Defendant's practices, policies, and controls.

327. Defendant's unlawful practices were material and likely to mislead a reasonable consumer, and they did mislead Plaintiff and Nationwide Class Members. Defendant had exclusive knowledge of, and superior access to, facts regarding the design, implementation, sufficiency, and results of its practices and controls, and Defendant's omissions and misrepresentations prevented Plaintiff and Class Members from making informed decisions concerning their transactions and from taking steps to protect themselves from foreseeable and avoidable harm.

328. Defendant's conduct occurred and emanated from New Jersey and/or was directed from New Jersey where Defendant maintains its principal place of business and made material decisions, set policies, and controlled practices that gave rise to Plaintiff's and Class Members' injuries. Application of the NJCFA to the claims of Plaintiff and the Nationwide Class is appropriate because the misconduct was orchestrated, approved, and implemented in New Jersey;

Defendant's relevant policies and practices were devised and managed in New Jersey; and New Jersey has a substantial interest in regulating the conduct of businesses operating from within its borders and protecting consumers nationwide from deceptive and unconscionable practices emanating from New Jersey.

329. As a direct and proximate result of Defendant's unlawful practices, Plaintiff and Nationwide Class Members suffered "ascertainable loss" within the meaning of N.J.S.A. 56:8-19, including, without limitation: (a) out-of-pocket expenses; (b) loss of the benefit of the bargain and diminution in the value of the services received relative to what was promised and paid for; (c) overpayments or price premium attributable to Defendant's unlawful practices; (d) costs reasonably incurred to detect, mitigate, and remediate the consequences of Defendant's misconduct; and (e) other economic injuries and consequential damages that are concrete and measurable. The ascertainable loss suffered by Plaintiff and Class Members is causally connected to Defendant's violations of the NJCFA.

330. Plaintiff and the Nationwide Class justifiably and reasonably relied on Defendant's material representations, omissions, and course of conduct, and, even where actual reliance is not required, there is a sufficient causal nexus between Defendant's unlawful practices and the ascertainable losses suffered by Plaintiff and Class Members.

331. Defendant's unlawful practices were knowing, willful, and/or in reckless disregard of Plaintiff's and Class Members' rights, and persisted despite red flags, internal and external warnings, and industry guidance that put Defendant on notice of the risks and the need for reform.

332. Plaintiff and all others similarly situated are thus entitled to all appropriate legal and equitable relief, an award of treble their damages, plus attorney's fees, and costs pursuant to N.J.S.A. 56:8-19.

**COUNT EIGHT**
**VIOLATION OF OHIO CONSUMER SALES PRACTICES ACT**
**R.C. 1345.01, *et. seq*.**
**On Behalf of Plaintiff and the Ohio Subclass**

333. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

334. The Ohio Consumer Sales Practices Act ("OCSPA"), Ohio Rev. Code § 1345.01 et seq., prohibits unfair and deceptive acts or practices in connection with consumer transactions.

335. Ohio Rev. Code § 1345.02(A) provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction."

336. Ohio Rev. Code § 1345.02(C) requires that "[i]n construing division (A) of this section, the court shall give due consideration and great weight to federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection 45 (a)(1) of the 'Federal Trade Commission Act.'"

337. The OCSPA is a remedial consumer protection statute that must be construed liberally in favor of consumers to effectuate its protective purposes.

338. Defendant is a "supplier" within the meaning of the OCSPA because it provides business services including claims processing, payment integrity, health plan administration, and other services that are ultimately supplied to and for the benefit of consumers, including Plaintiff and Class Members.

339. Defendant engages in consumer transactions through its provision of services that involve the collection, use, storage, and processing of consumers' Private Information for economic benefit.

340. Plaintiff and Class Members engaged in consumer transactions with Defendant within the meaning of the OCSPA.

341. Although Plaintiff and Class Members did not contract directly with Defendant, they are indirect consumers whose information, payments, and participation enable and compensate Defendant's services. Specifically:

a) Plaintiff and Class Members provided their Private Information to Defendant for Defendant's use and economic benefit in providing services to its Clients;

b) Payments made by or on behalf of Plaintiff and Class Members for healthcare and insurance services included compensation that was passed through to Defendant for its data processing and administrative services;

c) Defendant could not provide its services or generate revenue without obtaining, using, and processing the Private Information of Plaintiff and Class Members;

d) Plaintiff and Class Members received a direct benefit from Defendant's services in the form of claims processing, benefit administration, and other functions that facilitated their access to healthcare and insurance benefits; and

e) Plaintiff and Class Members necessarily interacted with Defendant's systems and services through the provision and processing of their Private Information.

342. The nature of healthcare services and data processing creates an indirect but substantial consumer relationship between patients whose data is processed and the entities that process that data for profit.

343. Plaintiff and Class Members had no choice regarding whether their Private Information would be provided to Defendant, as Defendant's involvement was a necessary condition of receiving services from Defendant's Clients.

344. Defendant committed deceptive acts or practices in violation of Ohio Rev. Code § 1345.02(B) by representing the following:

a) Misrepresenting Performance Characteristics and Benefits (§ 1345.02(B)(1)): Defendant represented that its services had the performance characteristic and benefit of adequate data security to protect Private Information from unauthorized access, disclosure, and misuse, when in fact its services did not have this characteristic or provide this benefit. Defendant's data security measures were grossly inadequate, as evidenced by the multi-month intrusion, exfiltration of unencrypted data, and failure to detect or prevent the breach.

b) Misrepresenting Standard and Quality (§ 1345.02(B)(2)): Defendant represented that its services were of a particular standard and quality, specifically that its data security practices met or exceeded applicable industry standards, federal regulatory requirements, and best practices for protecting sensitive personal and health information. In fact, Defendant's services were not of this standard or quality, as Defendant failed to implement basic security measures including encryption,

adequate access controls, intrusion detection, monitoring, and network segmentation that are required by industry standards such as NIST, HIPAA Security Rule requirements, and FTC guidelines.

c) Failure to Supply as Represented (§ 1345.02(B)(5)): Defendant represented that its services would include adequate safeguards to protect Private Information in accordance with applicable legal requirements and industry standards. Defendant failed to supply its services in accordance with these representations, as its inadequate security measures failed to prevent unauthorized access and exfiltration of Private Information for nearly three months.

d) Misrepresenting Rights and Obligations (§ 1345.02(B)(10)): Defendant represented that its consumer transactions involved legal obligations to protect Private Information under HIPAA, the HITECH Act, and the FTC Act, and that Defendant was complying with these obligations. These representations were false, as Defendant violated its obligations under these statutes by failing to implement required security measures and by failing to provide timely breach notification.

345. Defendant committed unfair and deceptive acts or practices in violation of Ohio Rev. Code § 1345.02(A)'s general prohibition, including:

a) Collecting and using Plaintiff's and Class Members' highly sensitive Private Information while failing to implement reasonable and adequate security measures to protect it;

b) Representing, expressly or by implication, that Private Information would be adequately secured and protected, when Defendant knew or should have known that its security measures were inadequate;

c) Failing to disclose that its security measures were inadequate and that Private Information was at substantial risk of compromise;

d) Prioritizing its own profits over necessary investments in data security, thereby obtaining economic benefits through cost savings achieved by failing to implement adequate security measures;

e) Failing to encrypt Private Information despite knowing that encryption is a basic and necessary security measure for protecting sensitive data;

f) Failing to detect and stop unauthorized access to its systems for nearly three months, demonstrating grossly inadequate monitoring and intrusion detection;

g) Allowing unauthorized third parties to exfiltrate unencrypted Private Information, thereby exposing consumers to substantial risks of identity theft and fraud;

h) Failing to provide timely notification of the Data Breach, waiting approximately ten months after discovery to notify affected individuals, thereby depriving them of the ability to take prompt protective measures and exacerbating their harm; and

i) Continuing to possess and process consumers' Private Information without demonstrating that its security practices have been adequately remediated following the Data Breach.

346. Under Ohio Rev. Code § 1345.02(C), Ohio courts must give "due consideration and great weight" to Federal Trade Commission orders, rules, guides, and federal court interpretations of Section 5 of the FTC Act.

347. The FTC has repeatedly held that the failure to implement reasonable data security measures to protect consumers' personal information constitutes an unfair practice in violation of Section 5 of the FTC Act, 15 U.S.C. § 45.

348. The FTC has brought enforcement actions against entities, including healthcare service providers and business associates, for failing to implement reasonable data security measures. See, e.g., In the Matter of LabMD, Inc., 2016-2 Trade Cas. (CCH) 79708, 2016 WL 4128215 (FTC July 28, 2016) (finding that inadequate data security practices constitute an unfair act or practice in violation of Section 5 of the FTC Act).

349. The FTC has issued extensive guidance establishing that reasonable data security practices include, at a minimum, encryption of sensitive data, adequate access controls, intrusion detection and monitoring, regular security assessments, employee training, and prompt breach notification.

350. Defendant's conduct violates the standards established by the FTC for reasonable data security, and therefore constitutes an unfair practice under Ohio law pursuant to § 1345.02(C)'s requirement to defer to FTC interpretations.

351. The FTC's determination that inadequate data security is an unfair practice is entitled to great weight under Ohio law and establishes that Defendant's conduct violates the OCSPA's prohibition on unfair acts or practices.

352. Defendant knew or should have known that its representations regarding data security were false or misleading because:

a) Defendant knew it was collecting and storing highly sensitive Private Information;

b) Defendant knew that healthcare entities are frequent targets of cyberattacks and that the failure to implement adequate security measures would likely result in a data breach;

c) Defendant knew that industry standards, FTC guidelines, and HIPAA requirements mandated specific security measures that it failed to implement;

d) Defendant made conscious decisions about how much to invest in data security and chose to prioritize profits over adequate security measures;

e) Defendant knew that encryption, access controls, intrusion detection, and other basic security measures were necessary and feasible, yet failed to implement them; and

f) Upon discovering the Data Breach, Defendant knew that affected individuals should be promptly notified, yet waited approximately ten months to provide notification.

353. Defendant engaged in these unfair and deceptive practices knowingly, intentionally, or with reckless disregard for the truth and for consumers' rights.

354. Defendant's unfair and deceptive acts or practices were the proximate cause of injuries and damages to Plaintiff and Class Members.

355. Had Defendant implemented the data security measures it represented and that were required by applicable standards, the Data Breach would not have occurred, or its scope and impact would have been substantially limited.

356. Had Defendant truthfully disclosed that its security measures were inadequate, Plaintiff and Class Members or their healthcare providers could have taken steps to protect their information, including choosing providers that did not use Defendant's inadequate services.

357. Had Defendant provided timely notification of the Data Breach, Plaintiff and Class Members could have taken earlier protective measures to mitigate harm.

358. As a direct and proximate result of Defendant's violations of the OCSPA, Plaintiff and Class Members have suffered and will continue to suffer actual damages. Their Private Information has been stolen and compromised, creating an imminent, substantial, and ongoing risk of identity theft, medical identity theft, tax fraud, loan fraud, government benefits fraud, and other criminal misuse. Plaintiff and Class Members have incurred and will continue to incur out-of-pocket expenses for credit monitoring services, identity theft protection, credit reports, fraud alerts, and credit freezes. They have lost valuable time researching the breach, monitoring financial and medical accounts, reviewing credit reports, placing security measures, changing passwords, and otherwise responding to and mitigating the breach. Their Private Information, which is valuable property, has been diminished in value due to its compromise and publication. They have suffered loss of privacy through intrusion into their confidential health and personal information. They have suffered loss of the benefit of their bargain by paying for services that included adequate data security but receiving services with inadequate security. They have suffered and continue to suffer emotional distress, anxiety, stress, fear, and worry. They face the need for

ongoing monitoring and vigilance for years or decades into the future, as the compromised information cannot be changed and creates lifelong risks.

359. Plaintiff and Class Members are entitled to actual damages, treble damages, and reasonable attorney's fees and costs, under Ohio Rev. Code § 1345.09.

**COUNT NINE**
**INJUNCTIVE/DECLARATORY RELIEF**
**On behalf of Plaintiff and the Class**

360. Plaintiff, individually and on behalf of the Class, incorporates by reference each of the factual allegations contained in the preceding paragraphs as if fully set forth herein.

361. An actual, present controversy exists between the parties concerning Defendant's past and ongoing handling and safeguarding of the sensitive personal information of Plaintiff and the Nationwide Class, and the adequacy of Defendant's current data security measures. Plaintiff and Class Members continue to face a substantial, imminent risk of harm arising from the compromise and ongoing exposure of their information, which remains in Defendant's possession and in the hands of unauthorized third parties. Monetary damages alone cannot fully remedy these harms or protect Plaintiff and the Class from future injury.

362. The Court has authority under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, its inherent equitable powers, and applicable state law to

declare the rights and legal relations of the parties and to issue appropriate injunctive relief. Defendant also remains subject to duties imposed by common law and consumer protection statutes to implement and maintain reasonable security measures, provide accurate and timely notice of security incidents, and otherwise protect consumers' sensitive information from unauthorized access, use, and disclosure.

363. Plaintiff seeks a declaration that: (a) Defendant owes a legal duty to adequately secure and protect the personal information of Plaintiff and Class Members in its care, custody, and control; (b) Defendant breached and continues to breach that duty by failing to implement and maintain reasonable security procedures and practices commensurate with the sensitivity and volume of the information at issue; and (c) Defendant's current data security program remains inadequate to protect Plaintiff and Class Members from continued and future harm; and (d) Plaintiff and Class Members lack an adequate remedy at law to prevent further injury absent prospective relief.

364. Prospective injunctive relief is necessary to protect Plaintiff and Class Members from ongoing and future harm because: (i) Defendant continues to possess their sensitive information; (ii) the stolen information—particularly Social Security numbers and health-related information—cannot be changed and creates lifelong risk; (iii) the risk of future compromise and misuse persists; and (iv) only

enforceable, verifiable changes to Defendant's data security program can mitigate these risks.

365. Accordingly, Plaintiff, on behalf of herself and the Nationwide Class, requests that the Court enter an order requiring Defendant, at a minimum, to implement and maintain, at its own cost and subject to Court supervision the following measures:

a) Implement a comprehensive, written information security program reasonably designed to protect the confidentiality, integrity, and availability of personal information, with accountability at the senior-most levels and regular reporting to the Board or equivalent governing body;

b) Engage independent, qualified third-party security assessors to conduct initial and periodic (at least annually for five years) assessments, penetration testing, red-teaming, and audits of Defendant's information security program, including verification of remediation of any identified deficiencies;

c) Deploy and maintain enterprise-grade logging, monitoring, and intrusion detection and prevention capabilities; implement a Security Information and Event Management (SIEM) solution; and establish

24/7 security operations with incident response playbooks and table-top exercises;

d) Encrypt personal information at rest and in transit; implement strong key management; and ensure robust data loss prevention controls;

e) Implement role-based access controls, the principle of least privilege, and multi-factor authentication across all systems that store or access personal information; and conduct periodic access reviews and certifications;

f) Segment networks to prevent unauthorized lateral movement; harden endpoints and servers; promptly apply patches and remediate critical vulnerabilities pursuant to written SLAs;

g) Adopt data minimization, retention, and secure deletion policies to ensure that personal information is retained only as necessary for legitimate business or legal purposes and is securely destroyed when no longer needed;

h) Provide periodic, role-appropriate security and privacy training to all personnel with access to personal information, including phishing simulations and secure development training for engineers;

i) Require third-party service providers with access to personal information to implement and maintain reasonable security measures

and to undergo risk assessments, contractually mandating security controls, audit rights, and prompt incident reporting;

j) Provide, at no cost to Plaintiff and Class Members, extended credit monitoring, identity theft protection, and insurance for a period of not less than five years, with the option to renew upon a showing of continued risk, together with easily accessible identity restoration services;

k) Establish and maintain enhanced breach notification procedures to ensure timely, complete, and accurate notice to affected individuals and regulators consistent with applicable law and industry standards; and

l) Submit to the Court and class counsel, for a period of at least five years, periodic (e.g., semi-annual) certifications by a senior corporate officer, under penalty of perjury, attesting to Defendant's compliance with the injunctive provisions and the results of independent assessments.

366. Plaintiff further requests that the Court retain jurisdiction to enforce the declaratory and injunctive relief ordered herein and to enter any additional orders necessary to ensure Defendant's ongoing compliance.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and the Nationwide Class and all applicable subclasses, respectfully requests that the Court enter judgment in their favor and against Defendant and award the following relief for all claims asserted:

A. Class certification and appointment: Certification of the Nationwide Class (and Ohio Subclass), appointment of Plaintiff as class representative, and appointment of Plaintiff's counsel as class counsel.

B. Restitution and disgorgement of benefits unjustly retained, including establishment of a constructive trust as necessary, together with all other equitable relief the Court deems just as to Counts Three, Four, and/or alternatively Count Five;

C. Actual Damages to be determined at trial as to Counts One, Two, Three, Four and/or alternatively Count Six;

D. Punitive damages as allowed by law as to Counts Six;

E. Actual damages, treble damages where authorized, reasonable attorneys' fees and costs, and all other statutory and equitable relief available under the OCSPA as to Count Eight;

F. A declaration of the parties' rights and obligations consistent with the allegations;

G. A permanent injunction requiring Defendant to implement, maintain, and submit to Court-supervised verification of robust information security measures; provision, at no cost to class members, of extended credit monitoring, identity theft protection, and identity restoration services for not less than five years; and periodic compliance reporting and senior officer certifications for a period determined by the Court;

H. Treble damages under N.J.S.A. 56:8-19; restitution and/or disgorgement; injunctive and declaratory relief sufficient to end the unlawful practices and require ongoing compliance; pre- and post-judgment interest; and reasonable attorneys' fees, filing fees, and costs of suit as provided by statute as to Count Nine;

I. An award of pre- and post-judgment interest at the maximum rate permitted by law;

J. An award of reasonable attorneys' fees, filing fees, expert fees, and costs of suit as permitted by law and equity, including under fee-shifting statutes; and

K. Such other and further legal or equitable relief, including restitutionary and injunctive relief, as the Court deems just and proper to protect the interests of Plaintiff and the Class.

Dated: November 4, 2025

Respectfully submitted,
THE DANN LAW FIRM

BY: /s/ Javier L. Merino, Esq.
Javier L. Merino

*Counsel for Plaintiff Jordan Burwell and the putative class*

Brian D. Flick (OH #0081605)*
DannLaw
15000 Madison Avenue
Lakewood, OH 44107
Tel: (513) 645-3488
Fax: (216) 373-0536
notices@dannlaw.com
**Pro Hac Vice Application Anticipated*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial on all claims so triable.

## NOTICE TO ATTORNEY GENERAL OF ACTION

A copy of the Complaint will be e-mailed to the Attorney General of the State of New Jersey within twenty-four hours after the filing with the Court, pursuant to N.J.S.A. 56:8-20.

Dated: November 4, 2025

Respectfully submitted,
THE DANN LAW FIRM

BY: /s/ Javier L. Merino, Esq.
Javier L. Merino

*Counsel for Plaintiff Jordan Burwell and the putative class*